UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| A.G., a minor, by her parents and next friends, Marzena Sassak and Gregory Gorman, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 08321 |
| v. | ) ) | Judge Edmond E. Chang |
| City of Park Ridge; Thomas Swoboda, individually and in his official capacity as Retired Deputy Chief of Park Ridge Police Department; and Matthew McGannon, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2004, Park Ridge police officer Matthew McGannon pulled over Marzena Sassak and Gregory Gorman for a minor traffic violation. The couple's six-year-old daughter, A.G., was in the car at the time. After McGannon allegedly unlawfully arrested both Sassak and Gorman, he and other officers took the couple, along with A.G., to the police station. Now A.G. brings this action against the City of Park Ridge, former Deputy Chief Thomas Swoboda, and Officer McGannon, alleging that the Defendants violated her constitutional rights as well as Illinois state law.[1] The Defendants have filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), asserting that A.G. has failed to state a claim under either the Fourth or

---

[1]This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

Fourteenth Amendments. R. 22, Mot. to Dismiss.[2] For the reasons discussed in this Opinion, the motion to dismiss is granted in part and denied in part.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in A.G.'s Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). On December 26, 2004, Sassak and Gorman, along with their six-year-old daughter, A.G., headed home after attending a holiday event. R. 26, Am. Compl. ¶ 14. On their way home, at around 9:45 p.m., McGannon signaled for Sassak to pull over. *Id.* ¶ 17. He asked for Sassak's driver's license and for Sassak to get out of the car, which she did. *Id.*

Once Sassak was outside of the car, Gorman asked to speak with McGannon. Am. Compl. ¶ 18. In response, the officer "became loud and abusive[,] ordering Gorman back into the car and threatening to 'break both of [Gorman's] fucking wrists.'" *Id.* Shortly thereafter, Gorman again asked to talk to the officer. *Id.* ¶ 19. This time McGannon responded by "violently assault[ing] Gorman … by forcefully grabbing and dragging [him] to the back of the car, [and] slamming [his] head against the back of the car directly behind where A.G. was sitting … ." *Id.* After kicking, verbally abusing, and handcuffing Gorman, the officer proceeded to place Gorman under arrest, push him into the police car, and order him to "sit the fuck in the car." *Id.* ¶¶ 19, 20. A.G. witnessed this entire encounter between McGannon and her father. *Id.* ¶ 17.

---

[2]Citations to the docket are indicated by "R." followed by the docket entry.

After arresting Gorman, McGannon had Sassak take roadside alcohol sobriety tests. Am. Compl. ¶ 22. Sassak showed no signs of being under the influence of alcohol. *Id.* ¶ 23. In light of her husband's arrest, Sassak asked McGannon what was going to happen to A.G., who was still in the back seat of her parents' car. *Id.* ¶ 24. In response, McGannon screamed at Sassak, telling her "[that] she had no right to ask questions, that he did not have to answer questions about her daughter, and that by asking … questions Sassak was resisting arrest." *Id.* ¶ 25. He then grabbed Sassak by the arm and handcuffed her before pushing her into the back of his police car and announcing that she too was under arrest. *Id.* ¶ 26. In addition to witnessing the altercation between McGannon and her father, A.G. also witnessed the alleged assault and arrest of her mother. *Id.* ¶¶ 17, 28. According to the Amended Complaint, McGannon did not have probable cause to arrest either Sassak or Gorman. *Id.* ¶¶ 21, 27.

At this point, A.G. was crying and visibly shaken. Am. Compl. ¶ 28. McGannon eventually unbuckled A.G. from her safety seat after searching the back of her parents' car. *Id.* ¶ 29. Other officers arrived on the scene and took A.G., who was still crying, and put her in the back of another police car by herself. *Id.* ¶¶ 29, 30. The officers then arranged to take A.G. and her parents in separate cars to the police station. *Id.* ¶ 30. Before leaving, one officer asked Thomas Swoboda, the Deputy Chief of Park Ridge Police, for a child-safety seat for A.G. *Id.* Swoboda denied the request. *Id.* Once A.G. arrived at the police station, the officers had her wait for several hours in a room alone, where she continued to cry. *Id.* ¶ 31. The

3

Defendants never sought to make alternative arrangements for A.G. so that she did not have to sit by herself, wondering where her parents were. *Id.* ¶ 41.

The officers charged Gorman with obstructing a police officer and resisting arrest. Am. Compl. ¶ 33. They also charged Sassak with driving under the influence, resisting arrest, and child endangerment. *Id.* Less than two months after the incident, nearly all charges—save for one speeding ticket that Sassak pled guilty to—were dropped. *Id.* ¶ 34. A follow-up investigation of the altercation between McGannon and A.G's parents revealed that McGannon did not have probable cause to arrest either Gorman or Sassak. *Id.* ¶ 46.

A.G. now brings a Section 1983 action, alleging that the Defendants unreasonably seized her in violation of the Fourth Amendment and interfered with her family relationships and emotional well-being in violation of the Fourteenth Amendment. Am. Compl. ¶¶ 47-51. (A.G. also asserts various state-law claims not at issue in this motion. *Id.* ¶¶ 52-65.) The Defendants move to dismiss the federal claims for failure to state a claim, and argue that, with the federal claims dismissed, the Court should relinquish supplemental jurisdiction over the state-law claims. Mot. to Dismiss; R. 32, Def.'s Reply Br.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it

rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

#### A. Fourth Amendment

In the Amended Complaint, A.G. alleges that McGannon unreasonably seized her in violation of the Fourth Amendment when he pulled over her parents' car, arrested her parents, and took custody of her. Am. Compl. ¶¶ 47-51; R. 31, Pl.'s Resp. Br. at 2-5. The fact that McGannon did not have probable cause to arrest Sassak and Gorman, so A.G.'s theory goes, establishes that McGannon unlawfully

5

seized A.G. Am Compl. ¶ 35 ("Because the arrests of A.G.'s parents w[ere] without probable cause the seizure and detention of A.G. was not reasonable because there was no legitimate governmental interest at stake."); Pl.'s Resp. Br. at 3 ("Defendant McGannon takes the position that his actions were *reasonable* because after he committed the illegal acts upon A.G.'s parents he *had* to take custody of A.G. and that somehow the illegal conduct in assaulting and falsely arresting the parents (without probable cause) justified taking the young A.G. into custody and bringing her to the police station where she sat by herself literally for hours."). In response, McGannon contends that A.G.'s seizure was reasonable: McGannon did not verbally or physically abuse A.G. and the officers took A.G. to the police station for her own safety. Mot. to Dismiss at 3-7. The Defendants contend that even if A.G. was unreasonably seized, qualified immunity should kick-in to defeat the claim. R. 29, Def.'s Supp. Br. at 3-4; Def.'s Reply Br. at 8.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const., amend. IV. To determine whether a seizure was objectively reasonable,[3] courts look at the totality of the circumstances, "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other,

---

[3]As soon as her parents' car came to a halt, A.G. was seized within the meaning of the Fourth Amendment. *See Brendlin v. California*, 551 U.S. 249, 255 (2007) ("[A]lthough we have not, until today, squarely answered the question whether a passenger is also seized, we have said over and over in dicta that during a traffic stop an officer seizes everyone in the vehicle, not just the driver."); *id.* at 257 ("We think that in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission."); *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) ("[A] passenger is seized, just as the driver is 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'" (quoting *Brendlin*, 551 U.S. at 263)). So the only issue is whether the seizure was reasonable.

6

the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999); *see also Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). The totality-of-the-circumstances inquiry takes into consideration the manner and duration of the seizure. *Garner*, 471 U.S. at 8 ("Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out."); *see also Gill v. Vill. of Melrose Park*, 35 F. Supp. 3d 956, 962 (N.D. Ill. 2014) ("The reasonableness of the seizure also depends on its nature and duration."). So even though a seizure may be reasonable at its inception, an excessively long or overly intrusive detention can rise to the level of a Fourth Amendment violation. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). These general principles—both as to *when* a child may be seized at all and as to the *manner* of how the child may be seized—have been specifically applied to removing a child from his or her family. For example, in *Brokaw v. Mercer County*, the Seventh Circuit analyzed a child's Fourth Amendment claim[4] under those principles, and explained that a decision to seize a child is reasonable if there is a court order, probable cause, or exigent circumstances. With regard to the *manner* of the seizure, the Seventh Circuit held that the child had adequately stated a Fourth Amendment claim by alleging that

---

[4]Both A.G. and the defense discuss *Brokaw*'s impact on A.G.'s family-interference claim (which this Opinion addresses later), but *Brokaw* also established pertinent principles for the Fourth Amendment claim. 235 F.3d at 1010-12.

the defendants had removed the child from his home at night, in plain clothes, without knocking or identifying themselves, and "[m]ost significantly, they abruptly removed the screaming children from the home without explanation." *Id.* at 1012.

In this case, the defense argues that A.G.'s seizure was reasonable because the officers "had a legitimate governmental interest in keeping [A.G.] safe after her parents were arrested," and that "[t]here were no other adults present in the vehicle that could have taken custody of [A.G.]." Mot. to Dismiss at 6. The gist of the defense argument is that, with Sassak and Gorman under arrest, the police had to take A.G. into custody too. Generally speaking, taking a child to the police station with the child's parents is reasonable and makes perfect sense[5]—but only if the police reasonably arrested the *parents* in the first place. To hold otherwise would mean that a child (or, really, any passenger who would otherwise be stranded if a driver was falsely arrested) has no Fourth Amendment claim even though the child has been seized for no reason independent of the seizure of the parents. And it would mean that the parents would have a false-arrest claim under the Fourth

---

[5]There indeed are cases that say if the decision to seize parents was reasonable, then the decision to detain the child too is reasonable. *See, e.g.*, *Pittman v. City of New York*, 2014 WL 7399308, at *4 (E.D.N.Y. Dec. 30, 2014) (holding that minor did not have a Fourth Amendment claim after reasoning that "[w]hile it may have been a traumatic experience for an eleven-year-old boy to witness the events that unfolded, that was a consequence of the *valid traffic stop itself*, not of any unreasonable conduct of the arresting officers. The defendants' decision to remove Pittman III from the car while they detained and questioned Pittman Jr. was a reasonable one, and did not violate the minor's Fourth Amendment rights." (emphasis added)); *Guerrero v. Deane*, 750 F. Supp. 2d 631, 654 (E.D. Va. 2010) (granting summary judgment to the police after concluding that "[i]n light of [the] *reasonable seizures of Mr. and Mrs. Guerrero* … the circumstances, viewed objectively, justified Officer Potes's brief seizure of the Guerrero children for their safety while the officers effected Ms. Guerrero's arrest." (emphasis added)) *aff'd sub nom. Guerrero v. Moore*, 442 F. App'x 57 (4th Cir. 2011) (unpublished disposition). But the premise of those cases is that the decision to seize the parents was reasonable, and A.G. alleges here that (aside from the initial stop of Sassak for speeding) McGannon falsely arrested her parents.

8

Amendment, yet the child—whom no one asserts did anything to cause the seizure—would not. That flips the Fourth Amendment on its head, which requires the police to have a *lawful* basis for seizing a person, instead of authorizing a seizure based on the *unlawful* seizure of someone else.

Once this overarching justification of A.G.'s seizure is rejected, that leaves the initial stop of the car for speeding. Even A.G. concedes—as she must—that the initial stop was justified, Pl.'s Resp. Br. at 12, and indeed Sassak pled guilty to one of the speeding tickets, Am. Compl. ¶ 34. But A.G. has stated a Fourth Amendment claim as to the prolonged detention after what would be reasonably necessary to issue the speeding ticket (or even arrest Sassak for speeding) and as to the manner in which the detention was executed. According to the Amended Complaint, McGannon detained A.G., who was only six-years old at the time, for at least several hours. *See id.* ¶ 31. During the traffic stop, A.G. saw McGannon verbally and physically assault, as well as unlawfully arrest, both of her parents while she sat alone in the back seat of her parents' car. *Id.* ¶¶ 17-20, 22-26. Seeing all this, A.G. "was visibly shaken … and crying." *Id.* ¶ 28. Once other officers arrived at the scene, A.G. was placed in a police car—by herself—where she continued to cry. *Id.* ¶ 29. On top of this, A.G.'s detention continued on at the police station, where she sat crying—again in a room by herself—not knowing where her parents were. *Id.* ¶ 31. What's more, A.G. alleges that, throughout the hours-long custody, neither McGannon nor any other officer sought to make alternative arrangements for her, like asking Sassak and Gorman if there was a family member or some other adult

that could take A.G., or at least wait with her at the station. *Id.* ¶ 41. Indeed, remember that A.G. alleges that, even though Sassak was speeding, *Gorman*'s arrest was *entirely* false, *id.* ¶¶ 18-21, so there was no lawful basis to remove A.G. from Gorman's custody. The allegations as to the duration and manner of the seizure adequately state a violation of the Fourth Amendment.

To be sure, at this dismissal-motion stage, the Court is assuming the truth of the allegations and giving A.G. the benefit of all reasonable inferences. In particular, remember that A.G. brings the Fourth Amendment claim against McGannon alone, *see* Am. Compl. ¶¶ 47-51; Pl.'s Resp. Br. at 2 ("[A.G.'s Fourth Amendment] claim is directed against officer McGannon."), so she will have to prove that *McGannon*—as distinct from the other officers—was the cause of A.G.'s prolonged and isolated detention at the police station. Discovery will be needed from the other officers to figure out the evidence that supports (or refutes) this element of causation, but for now the causation allegation must be accepted as true.

In the alternative, the defense argues that qualified immunity applies to shield McGannon from liability.[6] Generally speaking, the doctrine protects

---

[6]A.G. argues that McGannon did not raise a qualified immunity defense until the Defendants filed a supplemental brief on the Fourth Amendment issue. Pl.'s Resp. Br. at 11. But even though the Defendants did not assert the defense in their initial motion to dismiss, A.G. still had a full and fair opportunity to respond to it—the Defendants filed their supplemental brief *before* A.G. filed her response brief to the Defendants' motion to dismiss. What's more, "the importance of resolving immunity questions at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curium), warrants consideration of McGannon's qualified immunity defense at the dismissal-motion stage, *see Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) ("Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)).

10

government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As robust as the doctrine is in shielding officials from liability, a plaintiff need *not* point to "a case directly on point" to establish that a reasonable official would have known that his actions amounted to a constitutional violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996) ("[L]iability is not predicated upon the existence of a prior case that is directly on point."). And "officials can still be on notice that their conduct violates established law even in novel circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) ("There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances."). So even where existing precedent is silent, a plaintiff can still overcome a qualified immunity defense if the "alleged misconduct constituted an obvious violation of a constitutional right." *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005), *as amended on denial of reh'g and reh'g en banc* (Mar. 4, 2005); *Brokaw*,

11

235 F.3d at 1022 ("[A] plaintiff need not always identify a closely analogous case; rather, he can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue.").

That is precisely the case here. It is true that there is a dearth of case law that presents the exact same set of facts as A.G.'s Amended Complaint, but that is not surprising—the allegations are rather unusual. But even so, considering all of the circumstances about A.G.'s prolonged and isolated detention, there is no room for debate: a reasonable police officer would know that he violated A.G.'s Fourth Amendment rights to detain her for several hours, alone in the car and then at the station with no explanation of what was happening with her parents, after assaulting her parents as she watched, and where the impetus for the detention was the unlawful arrest of her parents. Seizing A.G. in this manner was "such an elementary violation of the Fourth Amendment that the absence of a precisely analogous case is of no moment." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1181 (7th Cir. 1994); *cf. McDonald by McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) (rejecting qualified immunity defense after observing that "[i]t should have been obvious to [the Defendant] that his threat of deadly force—holding a gun to the head of a 9-year-old and threatening to pull the trigger—was obviously unreasonable given the alleged absence of any danger to [the Defendant] or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat."). What's more, by the

12

time of the seizure, the Seventh Circuit had decided *Brokaw*, *see supra* at 7-8, which emphasized that detaining a child "without explanation" was a significant fact pointing to the unreasonableness of the manner of a child's detention. *Brokaw*, 235 F.3d at 1012. So, taking the allegations in the Amended Complaint as true, A.G.'s Fourth Amendment claim cannot be dismissed on qualified immunity grounds at this stage.

**B. Substantive Due Process**

Moving on to the next set of claims, A.G. asserts two substantive due process claims: (1) interference with her family relationships; and (2) incursion on her emotional well-being. Am. Compl. ¶¶ 47-51. On the interference claim, she contends that her forced separation from Sassak and Gorman during the traffic stop and while at the police station, coupled with the fact that McGannon falsely charged Sassak with child endangerment, interfered with her family's right to remain together. Pl.'s Resp. Br. at 7-11. On the emotional-distress claim, A.G. not only relies on the forced separation from her parents, but also on McGannon's verbal and physical assault, as well as unlawful arrest, of her parents while she watched and cried. *Id.* at 5-7. The Defendants, unsurprisingly, object to A.G.'s substantive due process claims, asserting that A.G's substantive due process claims are merely duplicative of her Fourth Amendment claim, and that in any event, the Defendants did not violate her fundamental rights to familial integrity and emotional security. Mot. to Dismiss at 7-14; Def.'s Reply Br. at 3-7.

13

To be sure, the fundamental rights to familial integrity and personal security, which includes both physical and emotional well-being, are rights protected by substantive due process. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) (familial integrity); *White v. Rochford*, 592 F.2d 381, 385 (7th Cir. 1979) (emotional well-being). But the Defendants correctly point out that "'substantive due process may not be called upon when a specific constitutional provision … protects the right allegedly infringed upon.'" *Hernandez ex rel. Hernandez*, 657 F.3d at 474 (7th Cir. 2011) (quoting *Doe v. Heck*, 327 F.3d 492, 518 n.23 (7th Cir. 2003)). This means that where a plaintiff premises a Fourth Amendment claim and a substantive due process claim on the exact same conduct, generally speaking the due-process claim cannot go forward. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 394 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against ... physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims … ."); *Brokaw*, 235 F.3d at 1018 ("As to C.A.'s initial removal, the Fourth Amendment specifically addresses that seizure, and thus his claim should be considered under the Fourth Amendment, not under the rubric of substantive due process."); *Atkins v. Hasan*, 2015 WL 3862724, at *7 (N.D. Ill. June 22, 2015) ("Because Atkins's due-process claim is premised on her seizure, which is governed by the Fourth Amendment … the due-process claim cannot continue."). As discussed below, because the allegations underlying A.G.'s familial relations and emotional well-

being claims are part and parcel of her Fourth Amendment claim, they must be dismissed.

**1. Interference With Family Relations**

The crux of A.G.'s familial-interference claim hinges on the forced separation from her parents. In her response brief, A.G. asserts that "even temporary separations have been found actionable where, as here, there is no justification for the removal and no exigent circumstances. A.G. was separated from her parents and taken into police custody without justification or probable cause after the arrests of her parents … ." Pl.'s Resp. Br. at 7. A.G. also points to McGannon's decision to falsely charge her mother with child endangerment to further establish that the Defendants violated her due process rights. *Id.* at 9 ("The fact that McGannon went so far as to falsely charge [Sassak] with child endangerment—a charge that if proven could have resulted in A.G.'s removal from the home—was a severe threat to the family unit and although all charges were dropped that fear traumatized A.G. and her family.").

The problem with A.G.'s familial relations claim is two-fold. First, Defendants' removal of A.G. from her parents' custody is really an aspect of the unreasonable seizure claim. In other words, if McGannon had only unlawfully arrested one parent, or had promptly allowed A.G.'s parents to make alternative arrangements for someone else to take care of A.G., or had allowed A.G. to stay with her parents while at the police station, then A.G.'s Fourth Amendment claim would have been very different—and perhaps not viable at all. This demonstrates that

15

A.G.'s separation from her parents really gives rise to her Fourth Amendment claim, so re-scrutinizing the separation under the more-general substantive due process clause is forbidden. *See Hernandez ex rel. Hernandez*, 657 F.3d at 474 (reasoning that "[fifteen-month-old child's] claim arising from his initial removal [from his house] is properly analyzed under the Fourth Amendment because it is premised on his seizure and does not coincide with sufficiently separate conduct involving his relationship with his parents."). Second, that McGannon charged A.G.'s mother with child endangerment is also not enough on its own to establish that the Defendants interfered with A.G.'s family. A.G. concedes that the charge was dropped, Pl.'s Resp. Br. at 9, and the Amended Complaint is silent as to how the relationship between she and her mother suffered while the charge was pending. A.G's family-interference claim must be dismissed.

### 2. Incursion On Emotional Well-being

Like A.G.'s family-interference claim, her emotional-distress claim also relies on the forced separation from her parents, in addition to the assault and unlawful arrest of her parents. Pl.'s Resp. Br. at 5-7. In a nutshell, A.G. contends that the Defendants interfered with her emotional well-being by "forc[ing] [her] to witness the brutal assaults on both of her parents and their subsequent illegal arrests," "illegally tak[ing] [her] into custody, without a child restraint seat," and "br[inging] [her] to police headquarters where she was not allowed to see or be with her parents and where she sat alone for hours." Mot. to Dismiss at 6.

16

But this claim suffers from the same problem as the family-interference claim. All of the misconduct and harm that A.G. relies on to assert the emotional-distress claim arose from the allegedly unreasonable seizure. That is, A.G. does not allege any "sufficiently separate conduct" concerning her emotional well-being that gives rise to an independent substantive due process claim. *Hernandez ex rel. Hernandez*, 657 F.3d at 474; *cf. Pyles v. Vill. of Manteno*, 2014 WL 793531, at *3 (C.D. Ill. Feb. 26, 2014) (denying defendant's motion to dismiss where "the facts, as alleged in the complaint, sufficiently state[d] a claim that the manner in which the seizure was executed unreasonably infringed on Plaintiff's constitutional-protected interest in *bodily integrity and personal security*, in violation of the Fourth Amendment prohibition on unreasonable search and seizure." (emphasis added)); *Anderson v. Cornejo*, 1999 WL 35307, at *5 (N.D. Ill. Jan. 11, 1999) (dismissing plaintiffs' claim that defendants violated their substantive due process right to personal security after observing that "the Fourth Amendment itself protects against improper invasions of bodily integrity"). Here again, A.G. tries to premise a generalized substantive due process claim on the manner in which she was seized, an issue that her more-specific Fourth Amendment claim already covers, so the due process claim must be dismissed.

## IV. Conclusion

For the reasons stated above, the Defendants' motion to dismiss [R. 22] is granted in part and denied in part. The Fourth Amendment claim survives and the substantive due process claims are dismissed. Because a federal claim has survived,

17

the Court of course will not relinquish supplemental jurisdiction over the state-law claims. At the August 2, 2016 status hearing, the Court will set an answer deadline and the discovery schedule. The Court does encourage the parties to engage in settlement negotiations, now that the dismissal motion has been decided and the scope of the remaining claim is known.

          ENTERED:

          s/Edmond E. Chang
          Honorable Edmond E. Chang
          United States District Judge

DATE: July 27, 2016